# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BANKUNITED, N.A. and<br>BANKUNITED, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-0956-BWD |
| | ) | |
| BRETT SHULICK, MAGDALENA | ) | |
| GROCHOLA, ANTHONY KURCHE, | ) | |
| KYLE HARRIS, BRENDAN ROONEY, | ) | |
| and CUSTOMERS BANK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION DENYING
## MOTION FOR PRELIMINARY INJUNCTION

Date Submitted: December 19, 2025
Date Decided: January 2, 2026

William B. Larson, Jr., James Carignan, Wade A. Bredin, MANNING GROSS + MASSENBURG LLP, Wilmington, DE; OF COUNSEL: David Ross, Keith A. Markel, Alexander R. Yarm, Alana R. Mildner Smolow, MORRISON COHEN LLP, New York, NY; *Attorneys for Plaintiffs BankUnited, N.A. and BankUnited, Inc.*

Matthew D. Perri, Sandy Xu, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; OF COUNSEL: Kimberley E. Lunetta, VEDDER PRICE P.C., Miami, FL; Jeanah Park, VEDDER PRICE P.C., Chicago, IL; Elvira Razzano, VEDDER PRICE P.C., New York, NY; *Attorneys for Defendants Brett Shulick, Magdalena Grochola, Anthony Kurche, Kyle Harris, Brendan Rooney, and Customers Bank.*

**DAVID, V.C.**

This memorandum opinion denies a motion to preliminarily enjoin former employees and a competitor from soliciting the plaintiffs' employees and customers. Based on the record presented at a two-day evidentiary hearing, the plaintiffs are unlikely to succeed on the merits of their claims for breach of contract, breach of fiduciary duty, tortious interference with contract, or aiding and abetting breach of fiduciary duty.

## I. BACKGROUND

The following facts are as the Court finds them following a two-day evidentiary hearing held on December 16 and 17, 2025.[1]

### A. Brett Shulick Leads BankUnited's National Title Solutions Division.

BankUnited, Inc. is a Delaware corporation and holding company for BankUnited, N.A. ("BankUnited," and with BankUnited, Inc., "Plaintiffs"), a national bank headquartered in Florida that provides consumer and commercial banking products and services.[2] In 2023, BankUnited formed a separate National Title Solutions ("NTS") division from its National Deposits Group to provide banking and treasury management solutions to clients operating in the title industry.[3]

---

[1] The transcript of the evidentiary hearing is cited as "Tr. (Witness) at __". Dkts. 142–43. Joint exhibits are cited as "JX __". Dkt. 118.

[2] JX 196.

[3] Tr. (Fisher) at 14:4–15:10.

Today, NTS services more than a thousand customers or clients.[4]  On a daily basis, NTS updates and distributes to bankers a "PRC Householding report" (the "PRC Report") with more than 4,500 entries listing NTS's current and former clients, including parent companies and subsidiaries or affiliates.[5]

Defendant Brett Shulick led the NTS division as Executive Vice President and Managing Director from 2023 until August 15, 2025.[6]  During Shulick's tenure at NTS, the division grew in number of employees, clients, deposits, and profitability.[7] Shulick reported to the head of BankUnited's National Deposits Group, Benjamin Fisher, who in turn reported to BankUnited's Chief Executive Officer ("CEO"), Rajinder P. Singh.[8]  As of August 2025, three NTS Senior Vice Presidents reported directly to Shulick: Director of Partnerships, Magdalena Grochola; Director of Sales, Anthony Kurche; and Director of Banking, Kyle Harris.[9]  In total, twenty-three employees reported to Grochola, Kurche, or Harris, including Brendan Rooney (with Shulick, Grochola, Kurche, and Harris, the "Individual Defendants").[10]

---

[4] *Id.* at 16:14–16.

[5] JX 70; JX 71; JX 436.

[6] Tr. (Fisher) at 15:11–13; JX 160; JX 292.

[7] Tr. (Fisher) at 15:23–16:8.

[8] *Id.* at 11:2–4, 13:3–12, 53:16–21.

[9] JX 292.

[10] *Id.*

**B.    Shulick, Grochola, Kurche, And Harris Decide To Leave BankUnited For Customers Bank.**

By summer 2025, Shulick, Grochola, Kurche, and Harris had become frustrated with BankUnited's technology, compensation model, and senior leadership.[11] They discussed looking for other employment opportunities and agreed to make any move together.[12]

In June, Shulick's former colleague introduced him to Lyle Cunningham, the Chief Banking Officer of Customers Bank, a "branch-light" institution that describes itself as "a corporate bank for corporations."[13] On June 18, Shulick spoke with Cunningham by Zoom,[14] and on June 30, Shulick met in person with Cunningham and other Customers Bank senior leaders.[15] During these meetings, Shulick and

---

[11] *See* Tr. (Shulick) at 274:4–23 ("Although we had built a business that had over a thousand clients, we were not getting the support from senior management. Our technology kept failing. . . . I also felt that there was a significant inconsistency in the compensation model, and I didn't feel that there was a good cultural fit with how I was running the division and how the bank was running the rest of the institution."); *id.* (Grochola) at 427:1–7 ("We were unhappy at BankUnited."); *id.* (Kurche) at 446:8–15 ("Multiple frustrations that had built over several months. We were frustrated with leadership decisions. There w[ere] technological issues that were impacting clients. We were communicating these complications to the executive leadership team, and there was no corrective action.").

[12] *Id.* (Shulick) at 274:24–275:6; *id.* (Grochola) at 427:1–4; *id.* (Kurche) at 446:2–4; *id.* (Harris) at 474:15–19.

[13] *Id.* (Cunningham) at 160:18–19, 161:21–162:2, 170:5–8.

[14] *Id.* at 170:19–23.

[15] *Id.* at 175:7–176:15, 181:9–182:16; JX 76.

Customers Bank discussed a potential opportunity to grow a title solutions business within Customers Bank, similar to BankUnited's NTS division.[16] Shulick kept Grochola, Kurche, and Harris apprised of his early meetings with Customers Bank and scheduled a July 10 follow-up meeting for them to meet with Cunningham.[17]

Shulick and Cunningham discussed possibly "bring[ing] along" other BankUnited employees as well.[18] On July 1, in preparation for their next meeting, Shulick created a budget for a title solutions business within Customers Bank. Shulick compiled "names of the individuals that would be migrating over [from BankUnited], along with their position[s]," and proposed a "salary, and 1 year guaranteed bonus amount" for each individual, noting that restricted stock units ("RSUs") for some of the employees would vest in March.[19]

In addition, in their early meetings, Customers Bank asked Shulick whether he and Grochola, Kurche, and Harris were subject to contractual non-solicitation

---

[16] Tr. (Cunningham) at 170:24–171:8, 181:12–182:8; *id.* (Shulick) at 276:5–277:5.

[17] *Id.* (Shulick) at 277:21–278:8; *see* JX 75 at 1; Pls.' Opening Br. in Supp. of Their Mot. for a Prelim. Inj. [hereinafter OB] at 19, Dkt. 132; Defs.' Corrected Answering Br. in Opp'n to Pls.' Mot. for Prelim. Inj. [hereinafter AB] at 9, Dkt. 131.

[18] JX 76 at 1.

[19] JX 75 at 1; Tr. (Shulick) at 280:2–281:13, 367:3–13 (testifying that the "salary, bonus, and all the compensation numbers" were based on "projections of revenue based on Customers Bank's proprietary incentive plan model" and Shulick's professional experience).

4

obligations.[20]  Cunningham directed Shulick to "double-check every document [he] c[ould]" to "[m]ake sure there[] [were] no restrictive covenants or nonsolicitation language" in any agreements with BankUnited.[21]  On July 2, Shulick confirmed to Cunningham that he had "pull[ed] [their] RSU, code of conduct, and employee handbook documents," which contained "[n]o mention of non-solicitation [obligations]."[22]

To ensure they did not run afoul of any obligations, Shulick, Grochola, Kurche, and Harris also retained legal counsel at Kelley Drye & Warren LLP ("Kelley Drye").[23]  On July 11, they sent Kelley Drye copies of BankUnited's Code of Conduct and Employee Handbook,[24] as well as copies of two "equity omnibus agreements" under which the Individual Defendants had received equity awards from BankUnited.[25]  The equity omnibus agreements did not contain restrictive covenants.[26]

---

[20] Tr. (Shulick) at 285:6–14.

[21] *Id.* (Cunningham) at 184:1–4.

[22] JX 77 at 2.

[23] Tr. (Kurche) at 454:22–456:2; *see* JX 77 at 2.

[24] Tr. (Kurche) at 455:10–14; JX 87; JX 88; JX 93; JX 94.

[25] Tr. (Kurche) at 455:10–14; JX 89; JX 90; JX 91; JX 92.

[26] JX 90; JX 92.

Around the same time, Cunningham met in person with Shulick, Grochola, Kurche, and Harris and told them: "do not print, do not download, do not screenshot, do not take notes, . . . [and] do not bring anything to [Customers Bank]."[27] Two weeks later, on July 25, Customers Bank provided offer letters to Shulick, Grochola, Kurche, and Harris that similarly directed them to disclose any restrictive covenants related to their employment at BankUnited and not to bring confidential information with them to Customers Bank:

> If you have not already done so, you must disclose to the Company any and all agreements relating to your prior employment that may affect your eligibility to be employed by the Company or limit the manner in which you may be employed. It is the Company's understanding that any such agreements will not prevent you from performing the duties of your position and, by accepting this offer of employment, you represent that you are not under any obligation to a third party that would prevent you from performing the duties of your position with the Company. You further acknowledge and agree that you are not being asked to, and you agree not to, bring any third-party confidential or proprietary information or trade secrets to the Company, including that of any former employer, or put such information onto Company systems, and that in performing your duties for the Company you will not in any way utilize such information.[28]

After additional meetings and negotiation with Customers Bank, Shulick, Grochola, Kurche, and Harris made a collective decision to leave BankUnited to

---

[27] Tr. (Cunningham) at 197:14–198:1.

[28] JX 110; JX 112; JX 119; JX 133. The offer letters were revised on August 5.

6

grow a title solutions business within Customers Bank.[29] They signed updated offer letters from Customers Bank on August 6 or 7.[30]

### C. Shulick, Grochola, Kurche, And Harris Resign From BankUnited, And Customers Bank Makes Employment Offers To BankUnited Employees.

At 4:30 p.m. on Friday, August 15, Shulick, Grochola, Kurche, and Harris each resigned from their respective positions at BankUnited.[31]

That evening, Cunningham called fourteen employees in BankUnited's NTS division (and one additional BankUnited employee) and offered them employment with Customers Bank.[32] Cunningham asked each employee to respond to Customers Bank's offer by Sunday evening, August 17.[33] Shulick did not participate in Cunningham's calls, but spoke briefly with several employees, including Rooney, to inform them of his resignation from BankUnited.[34]

---

[29] Tr. (Shulick) at 275:3–6 ("We collectively made a decision that if we were ever going to pursue another opportunity, that it would always be the four of us leaving together."); *Id.* (Grochola) at 427:1–4; *id.* (Kurche) at 446:2–7; *id.* (Harris) at 474:15–19 ("It was a collaborative discussion and process[.]").

[30] JX 110; JX 112; JX 119; JX 133.

[31] JX 160; JX 161; JX 165; JX 166. Earlier that day, Shulick accessed the PRC Report ahead of a standing call during which he reported out on the NTS division. There is no evidence that he downloaded, copied, or otherwise took the PRC Report with him to Customers Bank. Tr. (Shulick) at 300:7–302:1.

[32] Tr. (Cunningham) at 200:7–203:7.

[33] *Id.* at 202:18–22.

[34] *Id.* (Shulick) at 397:19–398:4; *id.* (Rooney) at 505:20–506:2.

7

By the end of the weekend, eleven BankUnited employees accepted employment with Customers Bank.[35] BankUnited agreed to pay other employees additional compensation to incentivize them to remain with the company.[36]

BankUnited contends that the Individual Defendants then began aggressively soliciting BankUnited's clients and customers.[37] In text messages with one colleague, Shulick contemplated a "call a thon,"[38] while Shulick and Harris separately exchanged messages expressing a desire to "take all the clients" or "target" certain BankUnited clients.[39] While the Individual Defendants deny engaging in improper solicitation, they admit to contacting BankUnited customers between August 15 and August 22 to inform them of their departure.[40] As one example, Shulick testified that after his resignation, he called a prospective

---

[35] *See* JX 75; Tr. (Fisher) at 26:9–14 ("Ultimately, three [salespeople] stayed."); AB at 35–36 ("Four BankUnited employees accepted counteroffers from BankUnited and did not join Customers Bank . . . .").

[36] OB at 23.

[37] *Id.* at 26.

[38] JX 186 at 2; *see also* JX 295 at 3 ("Me and Kyle were hammer dialing."). Shulick denies actually making the calls. Tr. (Shulick) at 304:14–305:8.

[39] JX 199 at 4; JX 212 at 2; *see also, e.g.*, JX 188 at 8 ("I want to see [BankUnited] lose $1BN in the next 6 months.").

[40] Tr. (Kurche) at 456:6–24; *id.* (Harris) at 480:5–22; JX 199 at 3, 6–7, 10; *see also* AB at 14 ("[T]he Individual Defendants were unaware of any customer non-solicitation obligations until August 22, 2025. Consequently, certain defendants contacted BankUnited customers to provide notice of their resignations and, in some cases, to lay the groundwork for future business."); *see also, e.g.*, JX 171; JX 185; JX 190; JX 208; JX 209; JX 212; JX 222; JX 234.

8

BankUnited client to whom he had been pitching business for months.[41] Shulick explained that this individual put her professional reputation on the line to advocate for his team, and he felt he owed her an apology for his sudden departure.[42]

### D. BankUnited Sends Cease-and-Desist Letters To Customers Bank And The Individual Defendants.

On August 22, BankUnited sent letters (the "Cease-and-Desist Letters") to Customers Bank and the Individual Defendants, alleging that the Individual Defendants had violated non-solicitation obligations in the Code of Conduct and certain RSU and restricted stock award ("RSA") agreements (collectively, the "Award Agreements"), and had misappropriated BankUnited's confidential information and trade secrets.[43]

Prior to receiving the Cease-and-Desist Letters, the Individual Defendants were not aware of the Award Agreements and did not provide copies to either Customers Bank or their own counsel. After the Cease-and-Desist Letters identified the Award Agreements, the Individual Defendants were able to locate copies through an online benefits portal maintained by Merrill Lynch.[44] The Individual Defendants

---

[41] Tr. (Shulick) at 410:14–412:9; JX 199 at 7.

[42] Tr. (Shulick) at 410:14–23.

[43] JX 216; JX 217; JX 218.

[44] JX 221 (showing Shulick first accessed his Award Agreement on August 22, 2025); JX 219 at 5 (showing Kurche asked how to access the Award Agreement on August 23, 2025); *id.* at 8 ("We never saw this doc.").

9

learned that each year when BankUnited granted RSUs or RSAs as part of their compensation,[45] they "accepted" the awards through the Merrill Lynch portal, which prompted them to acknowledge their consent to the Award Agreements, which contained restrictive covenants.[46]

Specifically, Section 4(a) of the Award Agreements (the "Employee Non-Solicitation Provision") states that for one year after the restricted party's departure from BankUnited (the "Restricted Period"):

> the Participant, shall not, directly or indirectly, solicit, induce, recruit, encourage, take away (or attempt any of the foregoing actions) or otherwise cause (or attempt to cause) any current or former (subject to the limitation below) employee or individual independent contractor of the Company to leave his or her employment or engagement with the Company either for employment with the Participant or with any other entity or person, or otherwise interfere with or disrupt (or attempt to disrupt) the employment or service relationship between any such individual and the Company.[47]

In addition, Section 4(b) of the Award Agreements (the "Customer Non-Solicitation Provision") states that during the Restricted Period:

> the Participant shall not, directly or by assisting others, take any action to solicit, divert, take away, contact or call upon, or attempt to solicit, divert, take away, contact or call upon, any clients or customers, including prospective clients or customers, of the Company with whom

---

[45] JX 2–11; JX 14–20.

[46] *E.g.*, JX 17 ("Please read and acknowledge the Restricted Stock Award Agreement that will be provided upon acceptance of the award in the Merrill Lynch Benefits Online portal."); JX 33.

[47] JX 33 at 2.

the Participant had contact with [sic], provided services to or received information about during the Participant's employment with the Company at any time or for any reason during the two (2)-year period prior to the Participant's termination of employment, for the purpose of inducing or attempting to induce or divert their business away from, or in any way interfere with their relationship with, the Company.[48]

This memorandum opinion refers to the Employee Non-Solicitation Provision and the Customer Non-Solicitation Provision collectively as the "Non-Solicitation Provisions."

The Individual Defendants dispute that they had an opportunity to review the Award Agreements before accepting them.[49] However, according to an affidavit submitted by Martin J. Hirsch, a Product Manager with Merrill Lynch (the "Merrill Lynch Affidavit"), the Merrill Lynch platform required users to view the Award Agreements before accepting their equity awards.[50] The Individual Defendants deny that the online portal they accessed looked as described in the Merrill Lynch Affidavit.[51]

---

[48] *Id.* at 2–3.

[49] Tr. (Shulick) at 321:5–18; *id.* (Grochola) at 432:2–5 ("Q. Did you have an opportunity to review a restricted share unit award agreement related to this award before you clicked 'accept'? A. No."); *id.* (Kurche) at 451:8–11 (same); *id.* (Harris) at 477:17–20 (same); *id.* (Rooney) at 492:4–8 (same).

[50] JX 277 at 11.

[51] *E.g.*, Tr. (Kurche) at 453:6–17.

After receiving the Cease-and-Desist Letters, Customers Bank instructed its title solutions team to go "pencils down" and cease all client outreach pending further investigation.[52] On August 28, Shulick directed the team to "continue to pause any client outreach until advised otherwise."[53]

### E. This Litigation

On August 25, Plaintiffs initiated this action through the filing of a Verified Complaint (the "Complaint"), alleging claims for breach of contract and breach of fiduciary duty against the Individual Defendants and tortious interference with contract and aiding and abetting breach of fiduciary duty against Customers Bank (together with the Individual Defendants, "Defendants").[54]

Plaintiffs moved for expedited proceedings and a temporary restraining order.[55] At a September 5 hearing, the Court ordered expedition in advance of Plaintiffs' forthcoming motion for preliminary injunction and granted the request for a temporary restraining order, directing the parties to meet and confer on a form of order.[56]

---

[52] *Id.* (Cunningham) at 204:23–205:14.

[53] JX 226.

[54] Verified Compl. ¶¶ 89–125, Dkt. 1.

[55] Pls.' Mot. to Expedite, Dkt. 2; Pls.' Mot. for TRO, Dkt. 3.

[56] Dkt. 17.

Plaintiffs amended their Complaint, adding Rooney as a defendant, on September 16.[57] On September 26, the Court entered Defendants' proposed form of temporary restraining order (the "TRO"), temporarily enjoining Customers Bank and the Individual Defendants from (1) using or disclosing Plaintiffs' confidential information or documents; (2) soliciting BankUnited employees; or (3) using the Individual Defendants to solicit any "Prohibited [BankUnited] Customer" identified on a prohibited customer list.[58] The list that BankUnited ultimately provided included approximately 4,500 entries. The Court set a bond in the amount of $1.5 million.[59]

The parties completed briefing on Plaintiffs' motion for preliminary injunction (the "Motion") on December 12.[60] Ten witnesses testified at a two-day evidentiary hearing on December 16 and 17. The parties submitted additional testimony by deposition on December 19.[61]

---

[57] Am. Verified Compl., Dkt. 23.

[58] Order Granting Pls.' Mots. for a TRO and Expedited Proceedings ¶ 5(a)–(c), Dkt. 28.

[59] Telephonic Oral Arg. and Rulings of the Ct. on Defs.' Mot. to Set a Bond at 32, Dkt. 65.

[60] On November 20, Plaintiffs filed their opening brief in support of the Motion. OB, Dkt. 132. On December 4, Defendants filed their answering brief in opposition to the Motion. AB, Dkt. 131. On December 12, Plaintiffs filed their reply brief. Pls.' Reply Br. in Further Supp. of Their Mot. for a Prelim. Inj., Dkt. 135.

[61] Dkt. 139.

## II. ANALYSIS

BankUnited seeks a preliminary injunction enforcing the Non-Solicitation Provisions against the Individual Defendants and Customers Bank. "This Court has broad discretion to grant or deny a preliminary injunction." *Cleveland Integrity Servs., LLC v. Byers*, 2025 WL 658369, at *8 (Del. Ch. Feb. 28, 2025) (quoting *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 1223782, at *3 (Del. Ch. Mar. 24, 2010)). "To obtain a preliminary injunction, the movant must demonstrate: (i) a reasonable probability of success on the merits; (ii) a threat of irreparable injury if an injunction is not granted; and (iii) that the balance of the equities favors the issuance of an injunction." *Id.* A preliminary injunction "is not granted lightly," and "the moving party bears a considerable burden in establishing each of these necessary elements." *Fletcher Int'l*, 2010 WL 1223782, at *3 (alteration omitted) (quoting *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del. Ch. 2007)).

BankUnited's request for relief against the Individual Defendants is premised on alternative claims for breach of contract and breach of fiduciary duty. BankUnited's request for relief against Customers Bank is premised on alternative claims for tortious interference with contract and aiding and abetting breach of fiduciary duty. After a two-day evidentiary hearing, BankUnited has failed to demonstrate that it is likely to prevail on any of these claims.

14

**A.** **BankUnited Has Not Demonstrated That It Is Likely To Succeed On Its Claim For Breach Of Contract Against The Individual Defendants.**

BankUnited seeks to enforce non-solicitation obligations in (1) BankUnited's Code of Conduct and (2) Award Agreements between each of the Individual Defendants and BankUnited.

**1.** **The Code Of Conduct Does Not Create Enforceable Obligations.**

BankUnited first seeks to enforce non-solicitation and confidentiality obligations in its Code of Conduct. Defendants respond that the Code of Conduct does not create enforceable contractual obligations.

As a condition of his or her employment at BankUnited, each Individual Defendant "acknowledged" the Code of Conduct,[62] which includes the following language:

> During your term of service or employment and for a period of one (1) year thereafter, [you cannot] solicit any employee or agent of [BankUnited] to leave [BankUnited] for any other business, whether a competitor or otherwise.[63]

---

[62] JX 285 at 1, 12, 15, 28, 32.

[63] JX 30 at 14. The Code of Conduct also states:

> Confidential Information acquired in the course of business must be held in strict confidence, used solely for proper business purposes and must never be disclosed to, discussed with or divulged to unauthorized persons. . . . When you leave the Company, you may not retain, divulge or use any Confidential Information.

*Id.* at 7.

15

Each Individual Defendant also "acknowledged" BankUnited's Employee Handbook, which states that "employment at BankUnited is for an indefinite period of time, and either BankUnited or its employees may terminate the employment relationship at any time."[64]

The Code of Conduct and Employee Handbook do not create enforceable contractual obligations. "The law is well settled . . . that an employee handbook, which does not set forth terms, conditions, or duration of employment, does not constitute a contract between an employer and employee." *Elite Cleaning Co. v. Capel*, 2006 WL 1565161, at *4 (Del. Ch. June 2, 2006) (quoting *Bray v. L.D. Caulk Dentsply Int'l*, 748 A.2d 406 (Del. 2000) (TABLE)). Where "there has been no promise of employment for a definite or fixed period of time[,]" a code of conduct or employee handbook "does not create an enforceable contract right." *Id.* The Individual Defendants were at-will employees and received nothing in exchange for agreeing to restrictive covenants in the Code of Conduct.

Moreover, the Code of Conduct states that it "is not intended to and does not create any obligations to or rights in any employee, director, customer, supplier, competitor, stockholder or any other person or entity."[65] Thus, the Code of Conduct

---

[64] JX 300 at 4.

[65] JX 42 at 22.

itself expressly disclaims creating contractual rights for any party. *See Cancer Genetics, Inc. v. Hartmayer*, 2008 WL 323738, at \*5 (D.N.J. Feb. 5, 2008) (declining to enforce a "Code of Business and Ethics" where the code "expressly disclaim[ed] that it create[d] a contractual restrictive covenant"); 19 Williston on Contracts § 54:12 (4th ed.) ("An explicit and conspicuous disclaimer in an employee personnel manual, stating that no contract rights exist or that the policies in the manual are not intended to create contractual rights, demonstrates the employer's intent that the manual be treated as only a guide for the employee . . . ."). BankUnited therefore cannot obtain equitable relief premised on a purported breach of the Code of Conduct.

### 2. The Non-Solicitation Provisions In The Award Agreements Are Overbroad And Unenforceable.

BankUnited also seeks to enforce Non-Solicitation Provisions in Award Agreements into which each of the Individual Defendants entered while employed by BankUnited.[66] Defendants argue that the Non-Solicitation Provisions are unenforceable because (a) the Individual Defendants did not assent to the Award Agreements and (b) even if the Award Agreements are not invalid for lack of mutual assent, the Non-Solicitation Provisions contained therein are overbroad and unenforceable.

---

[66] JX 1; JX 4; JX 5; JX 8; JX 31.

### a. BankUnited Is Likely To Succeed In Proving That The Individual Defendants Assented To the Award Agreements.

A contract is valid only if it "manifests mutual assent by the parties and they have exchanged adequate consideration." *Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *6 (Del. Ch. Mar. 27, 2014) (quoting *Concord Steel, Inc. v. Wilm. Steel Processing Co., Inc.*, 2008 WL 902406, at *4 (Del. Ch. Apr. 3, 2008)). Defendants argue that the Award Agreements lack mutual assent for the following reason. According to Defendants, the Individual Defendants accepted their equity awards through a Merrill Lynch online benefits portal that required them to acknowledge their "acceptance" of equity awards and confirm their consent to the Award Agreements before receiving a copy of the agreement. Defendants argue that, as a result, the Individual Defendants did not "have reasonable notice, either actual or constructive, of the terms of the putative agreement and did [not] manifest assent to [its] terms." *Id.* at *6.[67]

Although the Individual Defendants each testified sincerely that they did not recall reviewing the Award Agreements on the Merrill Lynch portal,[68] the Merrill Lynch Affidavit convincingly demonstrates that the online platform does, in fact,

---

[67] *See* AB at 23.

[68] *See supra* note 50.

require users to open and view award agreements before accepting their terms.[69] Although the Merrill Lynch Affidavit does not explicitly state that the portal has not changed since the Award Agreements at issue were executed, I am convinced on the record before me that BankUnited is likely to succeed in proving that the Individual Defendants assented to the terms of the Award Agreements through the online portal. *See Newell Rubbermaid Inc.*, 2014 WL 1266827, at *6 (finding the defendant assented to an RSU agreement through an online portal that required users to click a box acknowledging that they had read the agreement).

As explained next, however, the Individual Defendants' assent to the Award Agreements is beside the point, because the Non-Solicitation Provisions therein are overbroad and unenforceable.

### b. The Non-Solicitation Provisions Are Unenforceable.

Assuming the Individual Defendants assented to the Award Agreements, the Non-Solicitation Provisions nevertheless are overbroad and unenforceable. "Delaware courts review non-compete and non-solicit agreements 'subject to Delaware law to ensure that they . . . (i) [are] reasonable in geographic scope and temporal duration, (ii) advance legitimate economic interests of the party seeking enforcement, and (iii) survive a balancing of the equities.'" *Sunder Energy, LLC v.*

---

[69] JX 277 at 11.

19

*Jackson* (*Sunder II*), 332 A.3d 472, 485 (Del. 2024) (quoting *Cantor Fitzgerald, L.P., v. Ainslie*, 312 A.3d 674, 684 n.65 (Del. 2024)).

The Award Agreements include both a Customer Non-Solicitation Provision and an Employee Non-Solicitation Provision. Both apply for a "Restricted Period" of one year following the restricted party's departure from BankUnited and are unlimited as to geography.[70] I assume for the sake of argument that both provisions are reasonable in duration and geographic scope, focusing my analysis instead on whether the provisions are otherwise appropriately tailored to protect BankUnited's legitimate economic interests—and find that they are not.

**The Customer Non-Solicitation Provision**.

The Customer Non-Solicitation Provision in Section 4(b) of the Award Agreements states that during the Restricted Period:

> the Participant shall not, directly or by assisting others, take any action to solicit, divert, take away, contact or call upon, or *attempt to* solicit, divert, take away, *contact* or call upon, any clients or customers, including *prospective* clients or customers, of the Company with whom the Participant had contact with [sic], provided services to or *received information about* during the Participant's employment with the Company at any time or for any reason during the two (2)-year period prior to the Participant's termination of employment, for the purpose of

---

[70] JX 33 at 2.

> inducing or attempting to induce or divert their business away from, or in any way interfere with their relationship with, the Company.[71]

The Customer Non-Solicitation Provision is vastly overbroad and not tailored to protect BankUnited's legitimate interests for at least three reasons.

First, the Customer Non-Solicitation Provision broadly purports to prohibit a restricted party from contacting any BankUnited client or customer about whom the restricted party "received information" during the two-year period prior to the restricted party's departure. The Customer Non-Solicitation Provision is not limited to customers about whom a restricted party received *confidential* information, nor is it further limited to include only those customers with whom the restricted party interacted during his or her employment with BankUnited.

In practice, while employed by BankUnited, the Individual Defendants received daily emails attaching basic customer and client information, including a PRC Report that included more than 4,500 entries. BankUnited has taken the untenable position that the Customer Non-Solicitation Provision applies to every one of the customers identified on that list—around 1,200 "households" when affiliated entities are grouped together. Although an "employer has an interest in the goodwill

---

[71] *Id.* at 2–3 (emphasis added).

created by its sales representatives and other employees,"[72] BankUnited does not have a legitimate interest in prohibiting any single employee from soliciting thousands of businesses as clients, including many clients with which the employee never came into contact.

The record developed at the preliminary injunction hearing highlights the unreasonableness of a Non-Solicitation Provision that covers more than a thousand customers and clients. The Individual Defendants have not memorized the 1,200 customers purportedly subject to the Customer Non-Solicitation Provision, nor could any person reasonably be expected to do so. As a result, to ensure compliance with the Customer Non-Solicitation Provision (and TRO) during the pendency of this litigation, Customers Bank was forced to implement a multi-step process in which each employee within its title division had to obtain sign-off from multiple levels of supervisors confirming that a client contact did not appear on BankUnited's restricted list before the employee could do his or her job.[73] In addition, to avoid breaching the Customer Non-Solicitation Provision, the Individual Defendants avoided social media outreach and networking events, for fear that they might

[72] *TriState Courier and Carriage, Inc. v. Berryman*, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004) (quoting *Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992)).

[73] Tr. (Shulick) at 335:8–337:13.

inadvertently "solicit" one of the hundreds of customers purportedly covered by the Customer Non-Solicitation Provision.[74]

Second, the overbreadth of the Customer Non-Solicitation Provision is compounded by the fact that it applies not only to current, but also "prospective," customers and clients. If the provision were not already unworkable, its attempt to cover unidentified prospective customers would render it so.

Finally, the Customer Non-Solicitation Provision purports to prohibit a restricted party from even "*attempt*[*ing*] to . . . contact or call upon[] any clients or customers[] of [BankUnited]."[75] Under this formulation, if the restricted party called a BankUnited client and the client did not answer, the restricted party nevertheless would be in breach. Such language is not appropriately tailored to protect BankUnited's legitimate interests.

### The Employee Non-Solicitation Provision.

The Employee Non-Solicitation Provision in Section 4(a) of the Award Agreements states that during the Restricted Period:

> the Participant, shall not, directly or indirectly, solicit, induce, recruit, *encourage*, take away (or *attempt* any of the foregoing actions) or otherwise cause (or attempt to cause) any current or former (subject to the limitation below) employee or individual independent contractor of the Company to leave his or her employment or engagement with the

---

[74] *Id.* at 338:1–340:19.

[75] JX 33 at 2.

Company either for employment with the Participant or with ***any other entity or person***, or otherwise interfere with or disrupt (or attempt to disrupt) the employment or service relationship between any such individual and the Company.[76]

In addition to prohibiting unsuccessful "attempts" at solicitation, the Employee Non-Solicitation Provision is fatally overbroad because it purports to prohibit the restricted party from "encourag[ing]" any employee to leave his or her employment with BankUnited for employment "with any other entity or person."[77] "This bar on 'encouragement' is facially overbroad and unenforceable as a matter of law." *HKA Global, LLC v. Beirise*, 2025 WL 3639811, at *5 (Del. Ch. Dec. 16, 2025). "The Court of Chancery recently held that a ban on 'encouraging' employees to leave is unenforceably overbroad because it captures non-competitive conduct." *Id.* at *6. It would be unreasonable to prohibit the Individual Defendants from "discuss[ing] whether joining a non-profit would be more personally rewarding and aligned with that person's values." *Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 759 (Del. Ch. 2023) (*Sunder I*), *aff'd in part, rev'd in part on other grounds*, 332 A.3d 472 (Del. 2024). "The non-solicit therefore restricts speech and conduct unrelated to unfair competition and advances no legitimate business interest." *HKA Global, LLC*, 2025 WL 3639811, at *6.

---

[76] *Id.* at 2 (emphasis added).

[77] *Id.*

### c. The Court Will Not Blue Pencil The Non-Solicitation Provisions.

The Court will not blue pencil the Non-Solicitation Provisions. "Delaware courts have the discretionary power to blue pencil overbroad restrictive covenants to align a company's legitimate interests and an individual's right to be free from unreasonable restrictions on their livelihood." *Sunder II*, 332 A.3d at 486. "[T]he court's decision to exercise that equitable power should be based on the covenants themselves and the circumstances surrounding their adoption . . . ." *Id.* at 490. For example, "Delaware courts have exercised their discretion to blue pencil restrictive covenants under circumstances that indicate an equality of bargaining power between the parties, such as where the language of the covenants was specifically negotiated, valuable consideration was exchanged for the restriction, or in the context of the sale of a business." *Id.*

Although I concluded above that BankUnited is likely to succeed in proving that the Individual Defendants assented to the Award Agreements through the Merrill Lynch online benefits portal, the circumstances under which the Individual Defendants entered into the Award Agreements demonstrate that blue penciling is inappropriate. The Individual Defendants did not know that the Award Agreements existed. The facts here offer a dramatic contrast to cases evincing equal bargaining power and opportunity for negotiation in which this Court has considered blue

penciling. Accordingly, the Court will not exercise its discretion to blue pencil the Non-Solicitation Provisions.

**B.** **BankUnited Has Not Demonstrated That It Is Likely To Succeed On Its Claim For Breach Of Fiduciary Duty Against The Individual Defendants.**

BankUnited also asserts a claim for breach of fiduciary duty against the Individual Defendants. "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

None of the Individual Defendants served as directors or officers of BankUnited. BankUnited nevertheless contends that the Individual Defendants, as "[h]igh ranking employees, executives, and persons with access to confidential information," owed fiduciary duties to BankUnited.[78] Although Delaware cases have held that "key managerial personnel"[79] can owe fiduciary duties to the corporation, the preliminary record suggests that of the five Individual Defendants, only Shulick conceivably fits that description. Grochola, Senior Vice President and

---

[78] OB at 56.

[79] *Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *9 (Del. Ch. May 18, 2009) ("These hallmark principles of agency law apply to traditional corporate fiduciaries, such as officers and directors, and to key managerial personnel."), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

Director of Partnerships; Kurche, Senior Vice President and Director of Sales; and Harris, Senior Vice President and Director of Banking, managed teams within the NTS division several levels below BankUnited's CEO. Rooney, as an Assistant Vice President, was one step further removed. Though the preliminary record on these individuals' responsibilities is not well developed, in my view, BankUnited is unlikely to succeed on its contention that the Individual Defendants other than Shulick were "key managerial personnel" owing fiduciary duties to BankUnited.

Shulick, in his role as Executive Vice President and Managing Director of NTS, led a team of more than twenty individuals and reported to Fisher, who in turn reported to Singh, BankUnited's CEO. Assuming, without deciding, that Shulick owed BankUnited fiduciary duties, BankUnited is unlikely to succeed on its claim that Shulick breached his duties.

> Under fundamental principles of agency law, an agent owes his principal a duty of good faith, loyalty, and fair dealing. These duties encompass the corollary duties of an agent to disclose information that is relevant to the affairs of the agency entrusted to him and to refrain from placing himself in a position antagonistic to his principal concerning the subject matter of his agency. Nevertheless, an agent has no duty to disclose to his principal information obtained in confidence, the disclosure of which would be a breach of duty to a third person. Nor does agency law prohibit an agent from acting in good faith outside his employment even though it may adversely affect his principal's business. Further, *an agent can make arrangements or preparations to compete with his principal before terminating his agency, provided he does not act unfairly or injure his principal*.

27

*Triton Constr. Co., Inc.*, 2009 WL 1387115, at \*9 (emphasis added) (footnotes omitted). "A breach of fiduciary duty occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity." *Beard Rsch., Inc.*, 8 A.3d at 602.

The preliminary record shows that Shulick, Grochola, Kurche, and Harris decided to leave BankUnited together—Shulick did not solicit them.[80] The preliminary record contains no other evidence that Shulick solicited BankUnited employees until after his resignation.

BankUnited likewise has presented no persuasive evidence that Shulick took confidential information from BankUnited. Cunningham directed Shulick and the other Individual Defendants not to bring confidential information to Customers Bank, and their offer letters reiterated that instruction.[81] BankUnited points to metadata showing that Shulick accessed the PRC Report on BankUnited's system the day of his departure,[82] but Shulick credibly testified that he accessed the

---

[80] *See supra* note 29.

[81] *See supra* notes 21, 28.

[82] *See supra* note 31.

28

document solely to prepare for a meeting during which he was responsible for reporting out on the NTS division.[83] BankUnited has identified no other evidence that Shulick (or any other Individual Defendant) misappropriated BankUnited customer lists or similar information.[84]

BankUnited also argues that Shulick used BankUnited information to prepare a budget for Customers Bank, but the preliminary record supports Defendants' position that the budget was not based on confidential information.[85] The employee names and positions included in the budget were publicly accessible on BankUnited's website and LinkedIn.[86] BankUnited's RSU vesting schedule was

---

[83] *Id.*

[84] In discovery, the Individual Defendants produced a list identifying BankUnited clients for whom they each stored contact information in the cell phones. JX 272. Shulick's list included less than a dozen clients, undermining any suggestion that he intentionally brought confidential client information with him to Customers Bank. *Id.* at 6–7. The other Individual Defendants' minimal client contacts similarly undermine any suggestion that they intentionally brought information with them. For example, BankUnited claims that Harris's "outreach was particularly effective because he had cell phone numbers for representatives of title companies," OB at 28, but the record indicates Harris had only nine client contacts saved in his phone. JX 272 at 8–9. Again, BankUnited contends that the Customer Non-Solicitation Provision prohibits the Individual Defendants from soliciting *thousands* of BankUnited clients.

[85] Tr. (Shulick) at 369:24–370:5 ("I put together a budget that I felt reflected, one, what [Cunningham] and I had discussed in terms of a ramp-up period; and, two, trying to pay people and attract talent. Those were the two variables I considered. I didn't consider what people were making . . . at the time."); *see supra* note 19.

[86] *See supra* note 19.

also public.[87]  And Shulick credibly testified that although he could have accessed employees' compensation information, he did not do so to prepare the budget.[88]

BankUnited is not likely to succeed on its claim for breach of fiduciary duty.

**C.**     **BankUnited Has Not Demonstrated That It Is Likely To Succeed On Its Claims Against Customers Bank.**

BankUnited seeks to enjoin Customers Bank from solicitation efforts based on claims for tortious interference with contract and aiding and abetting breach of fiduciary duty.

"Under Delaware law, the elements of a claim for tortious interference with a contract are: '(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury.'" *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A2d 983, 992 (Del. Ch. 1987)).  BankUnited bases its tortious interference claim on the Non-Solicitation Provisions, which are unenforceable.  Without identifying an enforceable contract, BankUnited cannot succeed on its tortious interference claim.

To prove a claim for aiding and abetting breach of fiduciary duty, a plaintiff must show "(1) the existence of a fiduciary relationship, (2) a breach of the

---

[87] *Id.*

[88] *See supra* notes 19, 85.

fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 389 (Del. 2024) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)). Because BankUnited is not likely to succeed on its predicate claim for breach of fiduciary duty, it is also unlikely to prevail on its claim for aiding and abetting.

### D. Irreparable Harm And Balance Of The Equities

Having found that BankUnited is not likely to succeed on the merits of its claims, the Court does not resolve whether BankUnited is likely to suffer irreparable harm in the absence of preliminary injunctive relief, or if the balance of the equities favors a preliminary injunction. The Motion must be denied.

## III. CONCLUSION

For the reasons explained above, the Motion is denied. The TRO is hereby dissolved.